IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2009

## STATE OF TENNESSEE v. JASON SCOTT LOMAX AND OPHELIA LOMAX

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 8203-A     Joe H. Walker, Judge**

—

**No. W2008-01615-CCA-R3-CD  - Filed October 21, 2009**

—

The defendants, Jason Scott Lomax and Ophelia Lomax, were each convicted of aggravated child abuse by causing serious bodily injury and aggravated child abuse by neglect or endangering a child. These offenses were merged and each defendant was sentenced to serve eight years in the Tennessee Department of Correction at 100 percent. On appeal, the only issue raised by the defendants is whether the evidence was sufficient to sustain their convictions for aggravated child abuse by causing serious bodily injury. Following a review of the parties' briefs, the record, and applicable law, we affirm the defendants' convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Periann S. Houghton (on appeal), Somerville, Tennessee, and David S. Stockton (at trial), Assistant Public Defender, Covington, Tennessee, for the appellant, Jason Scott Lomax.

Noel H. Riley, II, Dyersburg, Tennessee, for appellant, Ophelia Lomax.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Background
    The defendants were charged with one count of aggravated child abuse by causing serious bodily injury and one count of aggravated child abuse by neglect or endangerment against their

daughter, MPT[1]. The following evidence was presented at the defendants' trial. Michelle Brazier testified that she was the school nurse for the Lauderdale County School System and was working at Ripley Elementary School on February 26, 2007. On that day, MPT was brought to her office by the school counselor because she was limping. Ms. Brazier testified that she looked at MPT's foot "and there was a huge blister . . . [that] filled up the whole . . . instep" and her foot was swollen and red. Ms. Brazier stated that she was "blown away" and asked MPT what happened. Ms. Brazier said that MPT told her she had dropped Ramen noodles on her foot. Ms. Brazier later testified that she "did not feel like it had been done by Ramen noodles" because "it was so deep and wide[.]" Ms. Brazier called MPT's father, Mr. Lomax, but did not get an answer. While she was making the call, Ms. Brazier noticed a belt mark on MPT's right arm. After noticing this mark, Ms. Brazier told MPT that she recognized it as a belt mark and MPT shook her head. Ms. Brazier asked MPT if she could look at her back and when she pulled her shirt up "there was [sic] bruises, there was [sic] abrasions, all over her back." She stated that there were scab marks on the abrasions and MPT told her there was "blood in her pajamas when she had woken up that morning." Ms. Brazier recounted that MPT "would not give . . . much information at all. She was trembling and would barely even open her mouth to talk[.]" Ms. Brazier testified that several photographs reflected what she saw when she looked at MPT that day and the photos were entered into evidence.

Ms. Brazier testified that she told the principal about what she saw and said "I've got to call DCS." She "called DCS . . . [and] said, 'Ya'll [sic] are to meet in [the] emergency room. I'm taking this child to the hospital now.'" She accompanied MPT to the emergency room and stayed with her "until probably about 5:00, 5:30." She testified that she could not get in contact with MPT's parents, however, she only tried to call one number to get in touch with Mr. Lomax. She stated that MPT's demeanor did not drastically change while in the emergency room, but she did perk up and she wanted to watch cartoons after they fed her. She also stated that MPT appeared to be hungry and was inquiring about a pizza they ordered for her.

On cross-examination, Ms. Brazier testified that she did not see MPT's pajamas. She did not administer any aspirins, salves, medical care, or anything like that to MPT. She also testified that MPT did not tell her how she got the injuries on her back. On redirect examination, she testified that she could administer pain medication with parental consent and she did not have consent to give MPT medication. MPT received medical treatment at the emergency room. On recross-examination, she agreed that she did not call all the numbers that she had to try and get parental consent and MPT did not ask for pain medication.

Christy Land testified that she was a nurse in the emergency room at Baptist Lauderdale Hospital. She treated MPT in the emergency room on February 26, 2007. She said that when MPT arrived she assessed her as a "critical patient" and "did a head-to-toe assessment on her in the treatment room." She assessed that "[MPT] had severe trauma, front and back, from her head to the bottom of her feet." MPT was fifty percent of the national standard for height against weight and

---

[1] MPT was eleven years old at the time of the offense. It is our policy to refer to minor victims by their initials.

they "become concerned [with] anything below eighty percent." The assessment also considered her hair texture, and the integrity of her skin, teeth, and nails. She recalled that MPT was four feet, eight inches tall and weighed seventy pounds. MPT's hair was "brittle" and "[s]he had some tooth decay. Her nails were long. They weren't kept. Her skin was somewhat elastic. She was underweight, . . . dehydrated, malnourished." Ms. Land stated that they immediately addressed the nutrition issues by offering MPT something to eat so they could assess her eating. She remarked that "[t]hroughout the process of the day [MPT] ate all day[.]" According to Ms. Land, over the course of nine hours, MPT "ate two large muffins, . . . a medium pizza, two large orders of [f]rench fries, two [Twix] bars, and a bag of Skittles." Ms. Land testified that after the assessment, they made sure MPT's vital organs were okay by taking an x-ray and checking for internal injuries. The test results were negative and there was no internal bleeding or fractures. She stated that once the x-ray was cleared, they cleaned her wounds and measured them.

Ms. Land said that when she saw MPT at the emergency room "[s]he was very withdrawn, and she was shaking." She said MPT was not crying and was very quiet. According to Ms. Land, "[s]he would only answer certain questions . . . [and] would not make eye contact with [her] at all." Ms. Land stated that her primary goal during the treatment of MPT was "[t]o make sure she was in stable condition first[,] [a]nd then priority after that was safety." She said that a representative from the Department of Children's Services arrived and the Ripley Police Department placed an officer at MPT's door. MPT's parents never came to the emergency room and Ms. Land did not receive any phone calls or inquiries from them. She testified that she worked with MPT for nine hours in the emergency room. After being treated in the emergency room, MPT was transferred to Baptist Hospital, Tipton County.

Ms. Land testified that MPT was hospitalized at Baptist Hospital, Tipton County, from February 26th through March 1st. While there MPT was treated for "second degree burns of the left foot, malnutrition, [and] electrolyte imbalance." She further testified that they had "problems keeping [MPT's] calcium and . . . potassium . . . elevated to [a] normal [level,]" which is an indicator of long term malnourishment. She stated that this was a concern because it would deter the healing process of her wounds.

Ms. Land was shown several photographs taken of MPT, which were entered into evidence. She described the wounds on MPT's left foot as "definite second degree burns, bottom and top of foot." She stated that second degree burns are usually caused by "[e]ither high heat for long term [or] extreme heat . . . for a short term." Using the photographs, she testified that MPT had raised blisters on the top of her foot, but the one in the center of the foot had not yet risen on her arrival at the emergency room. There was an open wound that was the "actual second degree" burn and an open wound that was red and draining. She said that MPT's foot was swollen and there were blisters on her toes. She testified that MPT told her that "she was cooking Ramen noodles and dropped them [on] the floor and tried to clean them up." Ms. Land did not see any indication of a splash and testified that, in her opinion, the explanation was implausible. She said that food could not have caused these burns and "submersion in boiling water or hot grease" were the only two things in the kitchen that could have caused MPT's injuries.

Ms. Land was also shown photographs of MPT's buttocks, legs, and back and used the photographs to show the locations of MPT's open wounds, puncture marks and bruising. She explained that "[t]he red [bruises] are new[,] [the] [p]urple are old" and the yellow, which were not visible on the photograph, were "older bruises." She also identified "large hematoma[s] on both hips." She stated that some of the wounds were scabbed over and others were weeping or draining. According to Ms. Land, an old bruise takes "[u]p to three days . . . to lose the redness and/or the purple. New wounds can stay red up to forty-eight hours before they start to turn yellow." She also said that open wounds begin scabbing immediately depending on the presence of illness. MPT had open wounds when she came to the emergency room. She also looked at a photograph and identified "open skin areas . . . bruises . . . [and] crescent-shaped areas" on MPT's side and back. In photographs of MPT's arms, chest, and torso, Ms. Land described large open wounds and bruising. Using a photograph, she also described discoloration on MPT's face, particularly in her eye area, and redness on the bottom of her ear. She testified that MPT's jaw was swollen, "very red" and "turned purple" within hours. She recalled that the palms of MPT's hands were "extremely red when [she] came in."

On cross-examination, Ms. Land testified that she did not make any attempts to contact Mr. or Mrs. Lomax and there was no way they would have known where MPT was or how to call her. She did not remember how many patients other than MPT were there, but she did not compare her condition to anyone else because she was "set up in trauma." Ms. Land testified that MPT was not on the verge of death when she assessed her as critical care. She agreed that MPT was the patient with the most immediate need to see her. She clarified that "[a] bruise is a trauma to the skin. [A] [h]ematoma is trauma to the deeper tissue." She stated that boiling water could have caused the burns on MPT's foot. She also stated that she treated MPT with ointment to the wounds and pain control.

Ms. Land testified that at the time MPT came to the hospital there was a potential risk of death due to her injuries. She further testified that there was a "substantial risk of death" due to "[her] whole health care[,]" but the wound alone would pose a "potential risk of death." Ms. Land said that she found the foot injury most disconcerting and wound care was needed to prevent MPT's death. She stated that "if the wound had ruptured, was [their] concern", however, she agreed that a rupture would not cause immediate death. She testified that if untreated, infection could set in and cause a danger.

Ms. Land agreed that a person with foot trauma would not likely die within sixty minutes. She further agreed that the healthier a person is, the faster they would heal. She said that she asked MPT if she ate at school and MPT said that she ate breakfast and lunch at school. She assumed that the meals at school were balanced and she did not think a child eating them would be malnourished. Ms. Land said that she did not know whether MPT was starved from February 23rd through the 26th. She agreed that those four days alone would cause MPT to fall below standard and her development could be related to previous causes.

-4-

On redirect examination Ms. Land stated that the burns on MPT's foot did not appear to be splash burns and burns from boiling water because burns resulting from"[s]pilled water would be on top of the foot [and] splashes would go up into the leg area." She commented that "[t]here [were] no burns above the top of the foot." She stated that it did not appear that MPT's foot was submerged in boiling water because "all of the tissue surrounding the area . . . submerged [would have been] equally burned[,]" and MPT's burns were "sporadic." She also stated that if MPT had not been taken to the emergency room her wound could have caused death. She said that treatment of her foot caused MPT extreme pain and when anything was done to her injured foot, MPT "was crying and shaking. . . . Also her vital signs were elevated." On recross-examination, she stated that MPT's condition did not pose an immediate substantial risk of death when she was admitted and did not require extraordinary life-saving treatment.

Officer Don Mullins of the Ripley Police Department testified that on February 26, 2007, he went to the Lauderdale County emergency room after being advised by his dispatcher that there was "possible child abuse." (Vol. III, 70) When he arrived he spoke with Ms. Brazier, Ms. Land, and one of the emergency room nurses. He stated that when he went into the emergency room, he observed "numerous bruises, marks, scratches, [and] injury" on MPT. He stated that upon viewing the child, he and his supervisor began taking photographs of the injuries. He said that he tried to talk to MPT, but "she was very quiet. . . . [and] didn't have anything at all to say to [him] or [his] supervisor." After listening to Ms. Brazier and Ms. Land ask MPT about how she got her injuries, Officer Mullins developed the defendants as suspects. Officer Mullins was advised that the defendants had not been notified that MPT was in the emergency room, so he went to their residence.

Officer Mullins stated that when he arrived at the residence, Mr. Lomax answered the door and Officer Mullins advised him that he needed to speak with him. Officer Mullins told Mr. Lomax that "his daughter was at the ER in Ripley and that he needed to get dressed." Mr. Lomax got dressed and put on his "work pants", which Officer Mullins testified were West Tennessee State Penitentiary pants, and his "[s]tate-issued black leather belt." According to Officer Mullins, neither Mr. or Mrs. Lomax ever inquired what was wrong with MPT or why she was in the emergency room.

Officer Mullins took the defendants to the police station and read them their *Miranda* rights. Both defendants gave a statement. In his statement, Mr. Lomax wrote that "his daughter . . . was unhappy living with him and his wife, and that she was known to injure herself, mark herself up, in order to get attention, with the hopes of living with her biological mother." According to Officer Mullins, Mrs. Lomax wrote "[b]asically the same story[.]" Officer Mullins stated that he asked them if "there was anything that they wanted to tell [him] . . . [or] that they had left out." When he advised them that he did not believe that MPT had inflicted the injuries on herself, "they both quit talking." At that point, Officer Mullins arrested them and they were taken to the Lauderdale County jail.

Officer Mullins secured and executed a search warrant to inspect the residence for further evidence. While executing the warrant, his supervisor took pictures. Officer Mullins described and identified the photographs entered into evidence. In a photograph of the defendants' kitchen, Officer Mullins identified a microwave, sink, cabinet, and a hair "straightening iron or flat iron." He further

identified a refrigerator with "the refrigerator and the freezer part secured by . . . a bicycle chain with a combination lock." He could not recall if the lock was on the refrigerator when he initially went to speak to the defendants, but he said "it must have been[,]" because "they were taken into custody at that time, and nobody else went in that apartment." Officer Mullins testified that he took inventory of the food in the home and took a picture. He stated that there was three boxes of "something similar to hamburger helper mix, . . . a loaf of bread[,] Peeps[,] . . . a package of crackers, peanut butter and crackers, and then one box of cereal and some sugar." In the bottom cabinet near the floor there was a box of Ramen noodles. Officer Mullins testified that he searched the apartment for other items that might have been used on MPT and found a belt in the bedroom that was later identified as one that had been used on MPT.

On cross-examination, Officer Mullins testified that the search warrant was issued on March 15, 2007, seventeen days after the defendants were arrested. He said that the scene had not been secured and he gained entrance to the apartment through the property owner. He did not ask the defendants if there was anyone else who had keys to their apartment. He stated that he believed that the photographs taken depicted the amount of food in the house on February 26th. He could not remember if he saw a pot on the stove when he went to the apartment. He testified that employees at the West Tennessee Department of Correction "get paid every two weeks" and agreed that it possibly would have been toward the end of the month when the food level was down.

Officer Mullins stated that neither defendant asked to make a phone call and when he checked Mr. Lomax before taking him downtown, he did not recall him having a cell phone. He did not tell Mr. Lomax MPT's specific injury or how he thought she got hurt. He stated that Mr. Lomax was somewhat cooperative with him and polite. Officer Mullins agreed that Mr. Lomax did not know what the injuries were, but stated that he still expected him to be concerned because "[its] just common sense, when the police show up . . . and advise me that my child is in the hospital, I want to go see them, I want to see what type of injuries and how they got there." According to Officer Mullins, Mr. Lomax "didn't seem concerned that I was there." Officer Mullins further testified, on cross-examination, that when he went to the hospital, MPT was very quiet and was not hollering or screaming with pain. He did a follow-up investigation and was told by Mr. Lomax that he had custody of MPT because she was taken away from her biological mother due to drugs.

MPT testified that she was eleven years old and in the fifth grade. She was ten when she lived in Lauderdale County with her father Jason Scott Lomax and stepmother Ophelia Shaw (Lomax). She lived with them for two years. MPT recalled that the school nurse was looking at her foot and it was burned. MPT stated that "[her] step mom, Ophelia, . . . burn[ed] [her] foot with a straighten[ing] iron." According to MPT, this occurred the Sunday before she went to school and the nurse examined her. She stated that Mrs. Lomax burned her because "she wanted [her] to hold [her] arms up, and if they didn't stay up long enough or straight, she said that she was going to . . . burn [her] foot." MPT stated that she was unable to keep her arms up the way Mrs. Lomax wanted. Mrs. Lomax told her to "come over to the couch, and she burn[ed] [her] foot." MPT testified that she burned her on "[her] toes and [her] other part of [her] foot, not [her] heels, but in the center of it."

MPT identified a photograph of the straightening iron that Mrs. Lomax burned her with. She stated that Mrs. Lomax burned her three times and identified her in the courtroom.

MPT testified that in addition to burning her, Mrs. Lomax also whipped her with a belt each day that weekend. MPT identified one of Mrs. Lomax's belts in a photograph and said that Mrs. Lomax "had lots of other belts". MPT said that she was never told by Mrs. Lomax why she was getting whipped and there were days when both defendants whipped her. She stated that she never told her father that Mrs. Lomax whipped her because she was scared of Mrs. Lomax and scared that she would get another whipping. MPT also identified Mr. Lomax's work belt in a photograph and said that her father used it to whip her. She testified that he whipped her with that belt more than once during the weekend in question and identified him in the courtroom. Mr. Lomax whipped her on that Saturday and Sunday and she did not remember him using any other belt besides his black work belt. She further stated that her father hit her on her "butt" with the belt and nowhere else. MPT testified that she noticed blood on her pajamas when she woke up on Monday morning after both defendants whipped her. MPT said that it hurt when she got the whippings and when she put her shoe on Monday when she went to school. She said that her foot "still hurts a little, but not as much" and still makes her limp.

MPT said that she was not allowed to go in the refrigerator in her house and a chain was kept on it to keep her from doing so. She believed that the chain had been on the refrigerator for a couple of weeks. She stated that the refrigerator was locked because the defendants thought she went in it at night and "mess[ed] with the milk and drinks." She further stated that she was allowed to eat "Ramen noodles, anything that wasn't in the refrigerator."

On cross-examination, MPT testified that she knew the difference between the truth and a lie and that a lie was "something . . . that didn't really happen." She remembered telling Ms. Land that she burned herself with Ramen noodles and said that she lied because "[she] was scared." She also remembered speaking with Ms. Goodman at the Carl Perkins Center, about how the center was a good, safe place. She said that she told Ms. Goodman that she hurt her foot by spilling boiling water on it, but it was lie. MPT also admitted that she lied when Mrs. Lomax's attorney questioned her at the preliminary hearing. MPT testified that she did not like Mrs. Lomax presently, but "[she] did [like Mrs. Lomax] at the beginning until she started whipping [her]."

MPT stated that she told the story about Mrs. Lomax burning her "after [she] felt safe." She denied being coached into saying something different. She testified that, while at home, Mrs. Lomax whipped her Saturday afternoon and Sunday night. She agreed that on Saturday she was at Ms. Watts' home, but later said that "[she] [didn't] honestly remember where [she] was[.]" She remembered being home on Friday and Sunday and also remember Mrs. Lomax's brother coming to their home Sunday. MPT testified that her father was at work on Sunday when Mrs. Lomax burned her foot. MPT could not recall if her father was at work on Saturday. According to MPT, her father whipped her Saturday after he came home. She did not remember staying up watching movies that night or why her father whipped her. She stated that she was not making this story up to go back to her mother. MPT denied abusing herself and beating her hands against the walls.

MPT was shown a photograph and identified the flat iron that she said Mrs. Lomax used to burn her foot. MPT was also shown the photograph of her foot and she stated that she saw burns on her toes and cross mark burns on the top of her foot. She testified that she was sure that it was not Ramen noodles that fell on her foot and burned her. She stated that she did not know what on the flat iron made the cross marks, but that "it was a flat iron."

On redirect examination, MPT testified that Mrs. Lomax squeezed the flat iron on the bottom and top of her foot for "like a few seconds" and MPT felt it burning her foot. According to MPT, Mrs. Lomax burned her more than once. She said that the first time Mrs. Lomax just burned her toes and then made her put her arms up again. When her arms dropped, Mrs. Lomax burned her again by squeezing the flat iron on her foot. MPT testified that it took a long time for her to feel safe and to tell somebody what really happened. She stated that she was scared of Mrs. Lomax and she was scared to tell the truth about how her foot was burned.

Robin Gravely testified that she was employed with the Department of Children's Services when they received a referral regarding MPT on February 26, 2007. When she received the referral, she "immediately responded to the Baptist Hospital in Ripley." She stated that upon her arrival she was informed that MPT was getting x-rays and was shown the pictures taken by law enforcement. After MPT was done with her x-rays, Ms. Gravely observed her for "thirty to forty-five minutes." According to Ms. Gravely, MPT "appeared very withdrawn and afraid and [MPT] didn't really want to say much."

Ms. Gravely stated that after she left the emergency room she went to the Lauderdale County Jail and interviewed the defendants "to get both sides of the story." Ms. Gravely recounted the following from her interview with Mr. Lomax:

> [h]e told me that on February 23, [MPT] was whipped by Ophelia because she had gotten in some trouble. And then he also had [sic] stated that on February 24 he had whipped her himself because . . . she had done something to a printer. And then he also said that on that morning before school, which was February 26, he had whipped her again because . . . she had uninstalled some type of stuff for a printer.

She also stated that Mr. Lomax told her that he struck MPT with a belt ten times on Saturday, but did not state the number of times in the other instances. According to Ms. Gravely, Mr. Lomax described his work belt as the only one he used when whipping MPT. Ms. Gravely also testified that she interviewed Mrs. Lomax and was told that Mr. Lomax whipped MPT on Saturday night because of the computer. Ms. Gravely said that Mrs. Lomax never told her that she whipped the child.

Ms. Gravely stated that she followed MPT's case for "about sixty days." She saw MPT on March 6th, and took some photographs of her foot, which were entered into evidence. When she saw MPT on March 6th "[s]he was limping on her left foot when she was walking." Ms. Gravely also

testified that she saw MPT on March 29th at a doctor's appointment and MPT "was still limping on that same foot."

On cross-examination, Ms. Gravely testified that Mr. Lomax was cooperative with her during his interview. She said that she did not go to the home to investigate because she was "not allowed to go into a home unless the people who own the home or are renting the home are present." She said that she was told they were arrested, "but [she] still [had] to proceed with [her] investigation." She further testified that she was present when Ms. Goodman interviewed MPT and she remembered Ms. Goodman going into great detail to assure MPT that everything was safe. At the time of the interview, MPT had been removed from the defendants' custody. Ms. Gravely agreed that MPT had no reason to have any fears or problems at that time. She stated that she heard MPT tell Ms. Goodman that she burned her foot with noodles and did not hint that Mrs. Lomax burned her.

Defendant Jason Lomax testified that he did not know anything about MPT being burned with the straightening iron and was not aware of any injuries to his daughter. He stated that she never complained of anything to him and that she seemed normal. According to Mr. Lomax, he was never married to MPT's biological mother and received custody of MPT after "her mother just . . . abandoned her, more or less[.]" Mr. Lomax said that MPT wanted him and her biological mother to get back together. He stated that at the time he got custody of MPT, he and Mrs. Lomax were "about to be engaged" and they eventually got married.

Mr. Lomax stated that he used his work belt to discipline MPT and never used the belt with the studs on it. He demonstrated how he used it and explained that he held the buckle "[b]ecause . . . it's got buttons on the inside of it so you can take it apart. But you hold the buckle in your hand so that you don't have accidents." He said that he gave MPT "something like" ten whips with the belt and that she was being disciplined for "[t]earing up the computer."

Mr. Lomax stated that MPT has "always been skinny, like [him]." He said that "wasn't nothing [sic] hid out from the child" and "[MPT would] go in the refrigerator to eat supper, but she couldn't sneak in there in the middle of the night while we were trying to sleep." According to Mr. Lomax,

> [MPT] would fix herself a glass of milk and then replace it with water, and then you could look at it the next day and see that the water had sunk down to the bottom of the gallon of milk and could tell that she had been into it. We could hear . . . her feet walking across the floor . . . so we knew she was doing it. [I] [a]ctually got up and watched her, saw it one time. Several times actually.

He stated that he did not purposely starve MPT and sometimes he bought food she particularly liked. He also stated that MPT ate breakfast and lunch at school and he would be at work at suppertime.

Mr. Lomax testified that the only blood he ever saw on MPT's pajamas was "an old dried stain" from a bloody nose months earlier. He saw the pictures entered into evidence and said that he

had no idea she was injured that bad. He stated he did not check MPT for injuries because "[o]nce a child gets a certain age, you don't need to be seeing her naked[.]" According to Mr. Lomax, the officers did not tell him what type of injuries MPT had when they came to his home and he assumed it was about MPT punching the walls herself.

On cross-examination, Mr. Lomax testified that MPT had wanted to go back to her mother for a while and that MPT abused herself to get attention from other people. He said that "[MPT] [was] a good child" and she was only whipped "when she needed it." (Vol. IV, 162) Mr. Lomax admitted that he whipped MPT on Friday night, but denied whipping her on Monday. He stated that when he and Mrs. Lomax would give MPT whippings on the same day, "one didn't know about the other" and they did not communicate about who was giving her spankings. He agreed that a child would not want to stay in a home where she was getting whipped with belts all the time, but said that MPT has wanted "to go back to her mother for the longest" time. He said that Mrs. Lomax also used his work belt to whip MPT. He said that the refrigerator had only been locked for a "couple weeks[.]" In addition to getting milk out of the refrigerator, Mr. Lomax also stated that MPT tried to cook one night and that is why they locked the oven door and the refrigerator.

Mr. Lomax said that they lived in a one-bedroom home and MPT slept in the living room on the couch. He had an opportunity to observe her when he came home from work, however, he said it was winter and she wore long sleeves or was covered by a blanket. Mr. Lomax stated that he made sure MPT got on the school bus. On the day her injuries were discovered, he was not aware that she had anything wrong with her foot and did not notice her limping. He testified that he did not notice the bruising or swelling on her face and the red mark on her ear had been there forever. He denied telling MPT to wear long sleeve shirts to cover her bruises and that if she told anyone she would get a worse whipping. When handed the pictures of MPT's injuries, he testified that no child deserved a beating like that and that a computer or printer was not worth that kind of suffering. On recross-examination, he testified that he was not telling the jury that MPT inflicted the injuries herself, but denied that he or Mrs. Lomax inflicted the injuries. He was not aware of anyone else that whipped MPT.

Patricia Watts testified that she is Ophelia Lomax's mother. She stated that on Friday, February 23rd, Mrs. Lomax and MPT visited her home and during that time she observed MPT playing and "just being normal[.]" There was no animosity between MPT and Mrs. Lomax and she said that everyone was having a good time. She said that MPT and Mrs. Lomax also visited her home on Saturday and everyone was "having a good time, talking, laughing, . . . the kids playing." She did not see Mrs. Lomax whip MPT at any time during these two days. She said that "[MPT's] a sweet little girl" and "[she] didn't have any problems with [her]" She never heard of any friction or racial slurs between MPT and Mrs. Lomax and testified that they had gotten along fairly well.

On cross-examination, Ms. Watts concurred that she could only testify to what occurred at her home and she could not testify about what happened at the Lomax's home. She could not recall if MPT had on a long or short sleeved shirt when she visited that weekend. When shown the photographs of MPT's bruises, she stated that she would not have known if MPT was severely beaten

because she did not have an opportunity to see her bruises, but if she was beaten during that time MPT would not have been able to "sit right or play." She said that MPT's beating did not take place around her.

Bernard Taylor testified that he was Ophelia Lomax's brother and he has known MPT since Mr. Lomax received custody of her. He said that he was at the Lomax's home on February 25th and Mrs. Lomax was doing his hair. He stated that he was there between three and four hours and he had the opportunity to observe MPT. He said that she "looked normal" to him. During cross-examination, Mr. Taylor said that he had to sit still while getting his hair done and he was watching television while Mrs. Lomax was working on his hair. He testified that his attention was more on the television than MPT, but he said that he saw her and talked to her in passing conversation. He could not recall whether she had on long or short sleeves , but stated that he did not see any bruises. He agreed that MPT had her clothes on where probably he could not see her injuries, however, he said that "at that time if she would have been . . . injured to that extent . . . [he] would have . . . noticed something . . . strange." He also agreed that either MPT was good at covering her bruises up or the beating had not happened yet. Mr. Taylor remembered a lock being on the refrigerator because of an incident when MPT tried to cook and "almost burned the house down."

Ophelia Lomax testified that MPT came to live with her and Mr. Lomax around May 2005 and her and Mr. Lomax were married on August 26, 2006. She stated that the relationship between her and MPT was "kind of rocky . . . depend[ing] on [MPT's] mood[.]" According to Mrs. Lomax, MPT would "get in cars with strangers, and . . . she used a racial slurs[.]" Mrs. Lomax described photographs taken in the Lomax home of her and MPT, which were entered into evidence. One of the pictures showed a bath with rose petals that Mrs. Lomax prepared for MPT.

Mrs. Lomax stated that she never whipped MPT on February 23rd. She said that on Saturday she noticed she was having a problem with her computer so she took the computer to her mother's house so she could fix it. Mrs. Lomax said that when she got home she told Mr. Lomax about her computer. She asked MPT to show her what she had done to it and discovered that MPT had removed her drives. She said that Mr. Lomax asked MPT why she did it and MPT said she wanted to make Mrs. Lomax mad. She stated that while she was trying to fix her computer and listening to music Mr. Lomax spanked MPT in another room. After Mr. Lomax spanked MPT, Mrs. Lomax said that they heard a beating sound and MPT came out of the bathroom  and her hands were red. According to Mrs. Lomax, Mr. Lomax discovered that MPT has been punching the walls and he took pictures of the damage.

Mrs. Lomax denied burning MPT at any time with a hot iron. She also denied whipping MPT any time from February 23rd through the 26th. She stated that on Monday morning she was not feeling well and was in the bed when MPT left for school. She said that her last contact with MPT was on Saturday night when she washed her hair and she had no idea that MPT had the injuries.

On cross-examination, Mrs. Lomax testified that she actually washed MPT's hair on Sunday and had no further contact with her after that. She stated that Mr. Lomax gave MPT a whipping over

the computer and she "never gave her a whipping, not on that weekend, anyway." She said that when Officer Mullins came to her home he did not say that MPT was in the emergency room and when she asked what was going on, she was told she needed to go with Officer Mullins. She said that she was not aware why she was being questioned at the police station until she was asked why MPT would be in the hospital. Mrs. Lomax testified that she was concerned about why MPT was in the hospital in addition to why they were at the police department.

Mrs. Lomax said that she straightened her hair occasionally and identified her straightening iron in a photograph. She denied that she used the iron to cause blisters on MPT's foot and said she had no idea how they got there. She also denied that she had MPT hold her hands up as punishment. She identified her belt, but denied using it to whip anyone. Mrs. Lomax said that she never noticed the marks and bruises on MPT's face and arms and she denied responsibility for the marks. Mrs. Lomax testified that she was "not saying that [she] want[ed] . . . the jury to believe [MPT] did it herself. [She was] just letting the . . . jury know that [she] didn't do it." She stated that she is the primary caregiver for MPT, but she did not see any of the injuries depicted in the photographs and could not say whether they were caused by one whipping on Saturday. She said that the only whippings given to MPT during the relevant time period were on Saturday and Monday. She testified that no child deserved to be whipped like that over a computer and printer. She denied telling MPT that if she told anyone about the abuse her next whipping would be worse. She also denied instructing her to wear long sleeves to cover her injuries.

Based on the evidence presented at trial, the jury found the defendants guilty of one count of aggravated child abuse by causing serious bodily injury and one count of aggravated child abuse by neglect or endangerment, Class B felonies. The trial judge merged the offenses and the defendants were sentenced to eight years in the Tennessee Department of Correction at 100 percent.

Analysis

On appeal, both defendants argue that the evidence was insufficient to support their convictions. It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v.. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

To sustain the defendants' convictions for aggravated child abuse by causing serious bodily injury, the state was required to prove that the defendants committed the offense of child abuse, and the conduct resulted in serious bodily injury to the child. *See* Tenn. Code Ann § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury. *Id.* § 39-15-401(a). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty. . . ." *Id* § 39-11-106(a)(2). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(34)(A)-(E).

Viewed in the light most favorable to the state, we conclude that the evidence presented at trial was sufficient to sustain the defendants' convictions for aggravated child abuse by causing serious bodily injury. The defendants argue that too much emphasis was placed on MPT's foot and that the evidence and contradictions in the record, specifically MPT's conflicting testimony, made the decision making process irrational and therefore their convictions should be reversed. We disagree. Even though MPT gave different testimony at different times, she testified at trial that she had done so because she was scared of what would happen if she told the truth. The jury and not this court determines the credibility of witnesses and resolves conflicts in testimony. In this case, the jury heard MPT's explanation for her conflicting stories and accepted her testimony as true.

The evidence established that MPT suffered severe trauma from her head to the bottom of her feet. She had second degree burns on her foot as well as multiple old and new bruises and abrasions. Both parents admitted to using a belt to whip MPT. MPT testified that both Mr. and Mrs. Lomax whipped her on Saturday and Sunday and Mrs. Lomax whipped her on Monday. MPT also testified that Mrs. Lomax burned her with a straightening iron three times on Sunday. MPT was in pain when she was burned and whipped and at trial she said that her foot still hurt her and caused her to limp. The testimony of Ms. Land established that MPT was at fifty percent of the national standard for height against weight and that MPT was underweight, dehydrated, and malnourished. Ms. Land testified that there was a substantial risk of death as a result of MPT's condition as a whole. Accordingly, we conclude that a rational jury could have found the essential elements of aggravated child abuse by causing substantial bodily injury beyond a reasonable doubt.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the defendants' convictions.

-13-

_____
J.C. McLIN, JUDGE